UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x        No.: _____
EILEEN FLORES,

                              Plaintiff,

        -against-                                            **COMPLAINT**

LAFFEY REAL ESTATE, LLC,                                     *Jury Demanded*
U.S. 1 LAFFEY REAL ESTATE OF
BROOKVILLE, INC., LAFFEY FINE HOMES
OF NEW YORK LLC d/b/a LAFFEY REAL
ESTATE, and DONNA M. SCALA,

                              Defendants.
-------------------------------------------------------------x

        Plaintiff alleges, upon knowledge as to herself and her own actions, and upon information

and belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.  This is an action to recover damages as a result of the hostile working environment and
    adverse employment actions, up to and including termination, based upon Plaintiff's race,
    color and ethnicity as a former employee of Defendants in violation of Title VII of the
    Civil Rights Act of 1964 (Title VII) and the New York State Human Rights Law
    (NYSHRL), for unpaid overtime wages under the Fair Labor Standards Act of 1938
    (FLSA) and New York Labor Law (NYLL), as well as for the retaliatory termination of
    Plaintiff in violation of the NYLL.

## JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff brings
    certain of her claims under the FLSA and Title VII, each a federal statute.

3. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because the state claims are so related to the federal claims that they form a part of the same case or controversy between Plaintiff and Defendants.

4. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims took place within this judicial district.

## PREREQUISITES TO SUIT

5. Plaintiff has complied with all prerequisites to suit with respect to her claims under Title VII. Plaintiff filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission on or about August 6, 2021, and requested and received a Dismissal and Notice of Rights that was received on February 27, 2021.

6. This action is being filed within 90 days of Plaintiff's receipt of her Dismissal and Notice of Rights.

## PARTIES

7. Plaintiff EILEEN FLORES, at all relevant times, was an adult individual residing in the County of Queens and State of New York.

8. Defendant LAFFEY REAL ESTATE, LLC, at all relevant times, was a for-profit limited liability company organized and existing under the laws of the State of New York, with its principal place of business located at 45 Glen Cove Road, Greenvale, NY 11548.

9. Defendant U.S. 1 LAFFEY REAL ESTATE OF BROOKVILLE, INC., at all relevant times, was a for-profit corporation organized and existing under the laws of the State of New York with its principal place of business located at 55 Northern Blvd., Greenvale,

NY 11548.

10. Defendant LAFFEY FINE HOMES OF NEW YORK LLC d/b/a LAFFEY REAL ESTATE, at all relevant times, was a for-profit limited liability company organized and existing under the laws of the State of New York, with its principal place of business located at 55 Northern Blvd., Greenvale, NY 11548.

11. The three corporate defendants engaged in a real estate sales business that jointly employed Plaintiff at their "Brookville Office" located at 6336 Northern Blvd., East Norwich, NY 11732. The corporate defendants' joint employment of Plaintiff is evidenced by the fact that the corporate defendants share offices and personnel, jointly supervised Plaintiff and other employees, jointly provided guidance and training to Plaintiff and other employees, and at varying times paid Plaintiff out of each distinct entity.

12. At all relevant times, the three corporate defendants, separately or as an integrated enterprise, were, and are, engaged in interstate commerce within the meaning of the FLSA and have, upon information and belief, annual gross sales of at least $500,000.

13. At all relevant times, the three corporate defendants were subject to the Minimum Wage Order for Miscellaneous Industries and Occupations promulgated by the New York State Department of Labor, 12 N.Y. C.R.R. Part 142.

14. At all relevant times, the three corporate defendants, each or in the aggregate, employed more than 15 persons such that they are each an employer within the meaning of Title VII and the NYSHRL.

15. Defendant DONNA M. SCALA, at all relevant times, was an adult individual residing in

the County of Nassau and State of New York. Ms. Scala was a corporate officer, director, and manager, of U.S. 1 LAFFEY REAL ESTATE OF BROOKVILLE, INC. Ms. Scala was also one of Plaintiff's direct supervisors, and regularly exercised day-to-day operational control of U.S. 1 LAFFEY REAL ESTATE OF BROOKVILLE, INC. as the manager of the "Brookville Office" operated by Defendants, in that Ms. Scala assigned work to Plaintiff, scheduled and controlled Plaintiff's hours of work, hired and fired employees, and set the rate and method of payment to Plaintiff and other employees.

16. Defendants directly employed Plaintiff, individually and as joint employers, within the meaning of the FLSA, Title VII, NYLL, and the NYSHRL in that they controlled the means and manner of production of Plaintiff's work.

17. Defendant Scala, as an officer, director, shareholder, manager, or agent of the corporate defendants, had control over the day-to-day employment practices of Defendants and was responsible for the wage and hour and discriminatory practices complained of herein; therefore, she is an "employer" within the meaning of the FLSA, the NYLL, and the NYSHRL.

18. Plaintiff's primary duties were to serve as an administrative assistant at the "Brookville Office" under the direct supervision of Ms. Scala, the manager and head real estate agent there. These activities were conducted at Defendants' place of business.

## ALLEGATIONS COMMON TO ALL CLAIMS

19. Plaintiff began working for Defendants in 2003 as a part-time employee.

4

20. In March 2017, Plaintiff was made a full-time employee and was reassigned to work in the Brookville Office under the direct supervision of Ms. Scala, a real estate agent and the office manager of the Brookville Office.

21. Throughout most of the time Plaintiff was employed in the Brookville Office, she was employed as an administrative assistant.

22. Plaintiff obtained her real estate licence in March 2019 and was seeking to become a real estate agent when Ms. Scala began interfering with her job, as will be detailed below.

23. However, throughout Plaintiff's time in the Brookville Office, from March 2017 until the end of her employment in October 2019, Ms. Scala constantly subjected Plaintiff to a hostile work environment that was severe and pervasive based upon her race, color and ethnicity.

24. Additionally, Plaintiff was denied overtime wages as required by the FLSA and NYLL, was denied meal breaks as required by the NYLL, and was terminated as a result of her complaints regarding the same.

**<u>AS AND FOR A FIRST CLAIM FOR RELIEF</u>**

**<u>Title VII and NYSHRL - Hostile Work Environment and</u>**
**<u>Adverse Actions Based on Race, Color, and Ethnicity</u>**

25. Plaintiff is a Latina female of El Salvadorian and Puerto Rican descent.

26. Defendant Scala has made numerous comments to Plaintiff or in her presence, during nearly every shift that she worked, that are degrading to Plaintiff based upon her race, color, and ethnicity that have caused her to suffer an extremely hostile working environment based upon her protected, immutable characteristics, which affected her emotionally and psychologically both within and without the office.

27. Ms. Scala would constantly make these various degrading and inappropriate statements and remarks not only in Plaintiff's presence, but also targeted at her, both in private and in public, such that other employees could also hear them.

28. When Plaintiff mentioned that she shopped at a local shopping mall known as Roosevelt Field Mall, Ms. Scala said: "Of course you do. Only Spanish and black people go there. It's right next to the hood."

29. Ms. Scala has also said that she does not like going to Roosevelt Field Mall because of all "the Spanish people" and she feels like her "life is in danger."

30. Ms. Scala would often mention that her nephew is a member of the New York City Police Department. She then went on to complain about the "crap he has to go through." She then said: "It's always Spanish people and black people killing police officers. They have nothing better to do. They should go get a f---ing job!"

31. Ms. Scala has expressed her opinion that "Spanish people are always in the corner of the store, getting drunk."

32. Ms. Scala has said that "Spanish people's kids are getting our kids sick, and all they do is cause trouble. They should go back to their country!"

33. Ms. Scala would constantly assert her opinion regarding the building of "the wall" as a need to "keep these people out," mostly during the time when former President Trump and other political figures and the news media in this country were discussing the building of a wall to separate the southern border of our country from Mexico in an effort to curb illegal immigration.

34. For example, Ms. Scala has lamented that "Spanish people are taking over *my* country. Can't wait until they build the wall. They need to stay the f--k out!" (emphasis in original).

35. Ms. Scala often told the staff members and agents in the office: "Be careful renting to Spanish people because . . . ." and then finished the sentiment in a number of ways including:

    a.  Sometimes she would say "they multiply;"

    b.  Sometimes she would say "you have to be careful of these people;"

    c.  Sometimes she would say "they sublet it;" and,

    d.  Sometimes she would say "they ruin everything."

36. Ms. Scala would constantly refer to "your people" when addressing Plaintiff while also referencing "it's why we have to live like this," in the context of discussing her political opinions on immigration and crime allegedly caused by the Latino community.

37. Ms. Scala would also often refer to the size of Plaintiff's derriere in the context of saying that it was large, implying that the size of Plaintiff's derriere was related to the fact that she was Latina. Ms. Scala did this out in the open amongst other staff members and real estate agents.

38. Plaintiff once shared with Ms. Sala that Plaintiff had scheduled an open house in Commack, NY, that she would be hosting (this is after Plaintiff obtained her real estate license). After sharing this information, Ms. Scala immediately became irate and told Plaintiff: "You are at the bottom of the barrel and you don't know anything about that

side of town. You need to go where you came from. You need to host an open house on your side of town wherever you came from."

39. Also after Plaintiff obtained her license, Ms. Scala said: "I don't have time for this sh-t! I don't want you to have your license in my office. Park your license in another office; not mine. This isn't for you!"

40. Also after Plaintiff obtained her license, Ms. Scala went around to various other real estate agents and said things like "can you believe that Eileen got her license?," or "she should stick to her own people in Valley Stream and Hempstead," and "She's not going to do well around here."

41. The above are just some examples of what Plaintiff can remember, but such sentiments were repeated in various forms throughout the entirety of her time in the Brookville Office, but especially during times when the political landscape in this country was such that people were divided over issues such as immigration and the proposed wall to be built along our country's southern border. Ms. Scala would continually make other derogatory remarks (not quoted above) regarding her opinion on immigrants, such as how immigrants are ruining this country, how immigrants are responsible for the crime that occurs here, and expressed her support for the building of "the wall."

42. Ms. Scala's behavior, comments, and remarks deeply offended Plaintiff as an American of Latina ethnicity, and caused her humiliation, embarrassment, anxiety, stress, and a host of other emotions because she was employed by such a racist individual.

43. After Plaintiff obtained her real estate license, Ms. Scala would use her stature as an office manager to hinder her career on the basis of Plaintiff's race, color, and ethnicity, which ultimately led in part to Plaintiff's termination.

44. As noted in some of the comments above, Ms. Scala would prevent Plaintiff from utilizing her license and from attempting to gain clientele whom Ms. Scala believed were not the proper clients for the Brookville Office (i.e., anyone non-white).

45. Ms. Scala continually made comments to the effect that Plaintiff should focus on "your [Plaintiff's] side of town" and not host events for the predominantly white clients Ms. Scala was apparently accustomed to.

46. Given Ms. Scala's anti-latino and anti-black comments, it was clear that her motivation was to prevent Plaintiff from attempting to attract such clients and prevent her white clients from working with Plaintiff due to her race, color and ethnicity.

47. Approximately three months after Plaintiff obtained her real estate license, and after approximately three months of Ms. Scala's constant interference with Plaintiff's ability to use her license to attract clients, Defendants, through their regional manager Donna Marie, for no other justifiable reason, terminated Plaintiff for the stated reason that "it's not working out at the Brookville Office."

48. In reality, however, Plaintiff was terminated at the whim of Ms. Scala, who clearly did not believe "it was working out" with Plaintiff due to her pursuit of her real estate licence and a career in real estate while employed at the Brookville Office which, according to Ms. Scala, would attract clients from "the wrong side of town" to the Brookville Office.

Accordingly, Plaintiff's race, color, and ethnicity was a substantial or motivating factor behind Plaintiff's termination.

49. Prior to her termination, Plaintiff was not disciplined for any performance issues in any way, further leading to the conclusion that Ms. Scala was seeking to terminate Plaintiff for some other reason; namely, her race, color and ethnicity.

50. The foregoing conduct constitutes unlawful discrimination based upon race, color, and ethnicity in violation of 42 U.S.C. § 2000e-2(a) and NY Executive Law § 296(1)(a), making Defendants liable to Plaintiff for compensatory damages, attorneys' fees, and the costs and disbursements of this action.[1]

## AS AND FOR A SECOND CLAIM FOR RELIEF

## FLSA and NYLL - Overtime

51. Plaintiff normally worked 9:00 a.m. to 5:00 p.m., Monday through Friday, (sometimes with a one-hour lunch break) for a normal workweek of 40 hours.

52. From April to August of each year Plaintiff was employed at the Brookville Office (times when the real estate market is generally busier), Ms. Scala would require Plaintiff to clock out of work at her normal time of 5:00 p.m., but then remain working for a period of 1-2 hours after clocking out, Monday through Friday, in an effort to avoid paying Plaintiff overtime as required by law.

53. In certain weeks after Plaintiff obtained her license, Plaintiff would also work on Saturdays to host open house events and would further work on Monday evenings for

---

[1] Plaintiff recognizes that there is no individual liability for Ms. Scala under Title VII and therefore limits her claim under Title VII to as against the three corporate defendants only; however, there is individual liability under the NYSHRL and, accordingly, Ms. Scala may be held liable for her violations of the same.

approximately two hours performing work incidental to sales, such as marketing and posting ads.

54. Additionally, Ms. Scala would often contact Plaintiff outside of working hours when she was not scheduled, in the evenings, or on the weekends, to discuss work issues. Both the federal and New York State departments of labor consider such time "working time" for which an employee must be paid. Considering such time would be in excess of 40 hours in Plaintiff's circumstances, such time should have been paid at the overtime rate.

55. Even without considering Saturday work and the additional work on Mondays, or the time Ms. Scala spent contacting Plaintiff after hours, Plaintiff conservatively worked 47.5 hours per week simply in those periods of increased activity between April and August of each year.

56. Plaintiff earned $17 per hour in 2017 and $18 per hour thereafter, entitling her to time and one-half of such rates for all hours worked in addition to 40.

57. Additionally, the FLSA and NYLL require that an employee who is not paid overtime premium pay is also entitled to 100% of the amount owed as liquidated damages.

58. Plaintiff alleges that she is owed overtime pay and liquidated damages under the FLSA and NYLL (at minimum based on her conservative estimate) as follows:

|  | Base Wage | OT Rate | OT Hours | OT Owed Per Week | No. of Weeks | OT Owed Per Year | Liquidated Damages | Total Owed Per Year |
|---|---|---|---|---|---|---|---|---|
| **2017** | $17 | $25.50 | 7.5 | $191.25 | 20 | $3,825 | $3,825 | $7,650 |
| **2018** | $18 | $27 | 7.5 | $202.50 | 20 | $4,050 | $4,050 | $8,100 |
| **2019** | $18 | $27 | 7.5 | $202.50 | 20 | $4,050 | $4,050 | $8,100 |

| | | | | | | | **Total:** | $23,850 |
|---|---|---|---|---|---|---|---|---|

59. Defendants' failure to pay premium overtime pay to Plaintiff for all hours worked over 40 in any given workweek violates 29 U.S.C. § 207 and 12 N.Y. C.R.R. § 142-2.2.

60. Defendants' violation of the FLSA and NYLL in this regard was without a good faith basis to believe they were in compliance with the law, particularly considering that Ms. Scala would knowingly require Plaintiff to clock out at her usual time but also require her to continue working, in an effort to circumvent the time reporting requirements of the statutes.

61. Defendants are liable to Plaintiff for all premium overtime pay wrongfully withheld, plus liquidated damages in the amount of the overtime pay wrongfully withheld, pre- and post-judgment interest, attorneys' fees, and the costs and disbursements of this action.

<u>**AS AND FOR THIRD CLAIM FOR RELIEF**</u>

<u>**NYLL - Retaliatory Termination**</u>

62. Ms. Scala also did not allow Plaintiff to take meal breaks as required by the NYLL, with her complaints about the same leading in part to her retaliatory termination.

63. An employee such as Plaintiff, who works in New York, is entitled to have a half-hour meal break between the hours of 11:00 a.m. and 2:00 p.m.

64. Emails from the Defendants show that they were aware of this requirement, as Ronni Calandros wrote on August 23, 2019, apparently to all managers and secretaries, that the lunch period for administrative assistants was supposed to be provided between 12:00 p.m. and 2:00 p.m.

65. The above-mentioned email was prompted by various complaints from employees,

including Plaintiff, about not receiving their meal breaks.

66. Defendants also held a meeting with all administrative assistants where other complaints were raised about not receiving lunch.

67. The email from Ms. Calandros further directs managers to cover the telephones when an administrative assistant is out to lunch.

68. Notwithstanding this corporate directive, Ms. Scala would refuse to cover the telephones or would simply leave the office during the hours of 12 and 2, or purposely schedule meetings during such time, that would ostensibly give her an excuse to not cover the telephones, as directed, so that Plaintiff could take her lunch break.

69. When Plaintiff would ask to take her lunch period, Ms. Scala would state that she needed to work through her lunch hour because she was being paid for it, notwithstanding the corporate directive.

70. Ultimately, this prompted Plaintiff to ask on October 3, 2019, by email, to Ronni Calandros: "What are we supposed to do when managers are not in the office to cover the phones or when appointments and meetings are scheduled between 12 and 2?"

71. Considering the above back and forth email discussions concerning lunch, which are well-documented, and Plaintiff's continued requests to Ms. Scala and the corporate office to take her legally-required lunch, the termination of Plaintiff on October 18, 2019, just two weeks later, was clearly motivated in substantial part by such complaints and for no other legitimate reason.

72. Employees such as Plaintiff who are retaliated against for the complaints regarding violations of the NYLL are entitled to full back-pay in lieu of reinstatement. At Plaintiff's

final rate of pay, she is continuing to accrue damages for back-pay in the amount of $720 per week, plus up to $20,000 in liquidated damages pursuant to NYLL § 215(2)(a), attorney's fees, and the costs and disbursements of this action.

## JURY DEMAND

73. Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and prays that the Court:

A. Enter judgment in favor of the Plaintiff on each or any claim for relief for all compensatory damages and, where applicable, liquidated damages, punitive damages, attorneys' fees, pre- and post-judgment interest, and the costs and disbursements of this action; and,

B. Grant to Plaintiff any other and further relief that to the Court seems just and proper.

Dated: Uniondale, New York
        May 26, 2021                              Respectfully submitted,


                                        _____s/_____
                                        Eric S. Tilton
                                        Tilton Beldner LLP
                                        626 Rxr Plaza
                                        Uniondale, New York 11556
                                        (631) 629-5291
                                        etilton@tiltonbeldner.com